UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEWIS WICKE,

                Plaintiff,         Case No. 12-13329
                                            Honorable Bernard A. Friedman
                                            Magistrate Judge David R. Grand
v.

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [9, 12]**

Plaintiff Lewis Wicke ("Wicke") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [9, 12], which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.    RECOMMENDATION**

For the reasons set forth below, the court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Wicke is not disabled under the Act. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [12] be GRANTED, Wicke's Motion for Summary Judgment [9] be DENIED, and that, pursuant to sentence four of 42 U.S.C. §405(g), the ALJ's decision be AFFIRMED.

**II.    REPORT**

    **A.    Procedural History**

On December 3, 2008, Wicke filed an application for DIB, alleging disability beginning

on October 29, 2008. (Tr. 142-50). His claim was denied initially on February 13, 2009. (Tr. 91-94). Thereafter, Wicke filed a timely request for an administrative hearing, which was held on January 10, 2011, before ALJ Christopher Ambrose. (Tr. 58-88). Wicke (represented by attorney Mikel Lupisella) testified at the hearing, as did vocational expert ("VE") Norman Abeles. (Tr. 64-88). On January 19, 2011, the ALJ issued a written decision finding that Wicke is not disabled. (Tr. 46-54). On July 3, 2012, the Appeals Council denied review. (Tr. 1-4). Wicke filed for judicial review of the final decision on July 28, 2012 [1].

**B. Background**

*1. Disability Reports*

In an undated disability report, Wicke indicated that his ability to work is limited by bipolar disorder. (Tr. 163). When describing how this condition limits his ability to work, Wicke stated, "It is hard for me to focus on anythig [sic] – I get confused easily." (*Id.*). Wicke reported that this condition first interfered with his ability to work in 2004, and that he became unable to work on October 29, 2008. (*Id.*). He stopped working at that time because he "needed a medical cert signed to keep working and [his] doctor refused to say [he] was able to work." (*Id.*). *Cf. infra* at 4; fn. 2.[1] Prior to stopping work, Wicke worked as a heavy equipment operator (from 1972-2004) and as a truck driver (from April 2008-October 2008). (Tr. 164). Before that, he completed high school and received special training in heavy equipment operation. (Tr. 167). He indicated that he saw physicians at the Veteran's Administration ("VA") Medical Center regarding his bipolar disorder. (Tr. 166). At the time of the report, he was taking several medications, including hydrochlorothiazide (for high blood pressure), divalproex (for bipolar

---

[1] The medical records indicate that, on October 16, 2008, Wicke asked his physician to "certify [that] he can safely drive while on his medications." (Tr. 241). Wicke's physician listed the medications Wicke was taking but "declined to sign the letter." (*Id.*).

2

disorder), propranolol (to control tremors), Risperdal (for paranoia), rosuvastatin (for high cholesterol), and temazepam (to help him sleep). (Tr. 166).

In a function report dated January 4, 2009, Wicke reported that he lives in a house with his family. (Tr. 193). When asked to describe his daily activities, Wicke said only "try to stay active to keep things from getting to me." (*Id.*). He is able to cook and clean for his family. (Tr. 194). When asked what he could do before the onset of his condition that he is no longer able to do, Wicke said, "Operate heavy equipment, construction." (*Id.*). His condition interferes with his ability to sleep, unless he takes medication. (*Id.*). Wicke is able to attend to his own personal care, although he does not "bathe like [he] should," or shave or care for his hair properly. (*Id.*). He needs reminders to bathe and take medication. (Tr. 195). He is able to prepare his own meals, although he "forget[s] things, and joy is not there." (*Id.*). Wicke is able to perform household chores, including cleaning, mowing, and grading, on a weekly basis. (*Id.*). He is able to drive and shop (in stores, as well as by phone, mail, and computer). (Tr. 196). He is able to pay bills, count change, handle a savings account, and use a checkbook/money orders. (*Id.*). His hobbies include watching television, hunting, and fishing, although he has lost interest in these activities to some degree. (Tr. 197). He spends time with others, going out for coffee once a week. (*Id.*). He has problems getting along with family, friends, and neighbors "when [his] meds are low and [his] bipolar is acting up." (Tr. 198).

When asked to identify functions impacted by his condition, Wicke checked talking, memory, completing tasks, concentration, understanding, following instructions, using his hands, and getting along with others. (*Id.*). He can pay attention for "just seconds," and he is unable to finish what he starts. (*Id.*). He follows written instructions "poorly," and is "not good at all" at following spoken instructions. (*Id.*). If his bipolar disorder is "acting up," he does not get along

3

with authority figures. (Tr. 199). He does not handle stress or changes in routine well. (*Id.*).

In an April 6, 2009 disability appeals report, Wicke reported that he continued to suffer from bipolar disorder, paranoia, and confusion. (Tr. 202). Since the time of his last report, he had begun seeing "Dr. Ahmed" for therapy regarding his bipolar disorder. (Tr. 203). He continued to take the same medications and reported that he was "unable to do much activity because of severe uncontrolled bipolar [disorder]." (Tr. 205).

### 2. *Plaintiff's Testimony*

At the January 10, 2011 hearing before the ALJ, Wicke testified that he lives in a house with his mother, his wife, and his youngest daughter. (Tr. 65). He belongs to the Eagles club and volunteers at church once every few months. (Tr. 66). He drives to Midland (approximately 90 miles roundtrip) on weekends to help his daughter. (Tr. 75).

Wicke was diagnosed with bipolar disorder in 1994, but was able to work – despite that condition – until at least 2002, when he had a "run-in" and it became hard for him to keep a job. (Tr. 70). He worked for a period of time in 2008, but "that didn't work out." (*Id.*). Wicke testified that he stopped working on October 28, 2008, when his doctor refused to sign a medical certification saying he was able to operate heavy equipment, such as would be involved in construction, electrical plumbing, maintenance…truck driving." (Tr. 68).[2]

Wicke has received treatment for his bipolar disorder at VA clinics. (Tr. 72). He sees a psychiatrist every three months for a medication review. (Tr. 81). He testified that he has

---

[2] Wicke also testified that he has a torn tendon in his right shoulder, which makes it difficult for him to lift anything heavier than a gallon of milk, and some soreness in his right hip. (Tr. 73-75). Because Wicke does not object to the way in which the ALJ addressed his physical impairments, however, they will not be discussed in great detail herein. Moreover, the ALJ appropriately accounted for Wicke's physical ailments by finding him incapable of performing his past relevant work (including as a truck driver) and by limiting him to light work with "only occasional reaching with his right upper extremity." (Tr. 51, 53).

difficulty concentrating and is easily sidetracked. (Tr. 76). He needs reminders to take his medication and to bathe. (Tr. 69-70). He is not able to do things requiring multi-step instructions, saying that he is limited to "simple things." (*Id.*). He has difficulty being around groups of people, saying that he feels threatened by people and experiences racing thoughts. (*Id.*). He did admit, however, that the medication he takes has kept him relatively stable for the past few years, and he is able to better control his thoughts. (Tr. 72, 80).

        3.     *Medical Evidence*

           (a)     *VA Medical Center*

Wicke has received treatment for his bipolar disorder at the VA Medical Center since 2007. On July 18, 2007, Wicke underwent a Psychiatric/Psychosocial Assessment with Zulfiquar Ahmed, M.D. (Tr. 282-88). At that time, Wicke reported that he was suffering from paranoia, racing thoughts, and poor sleep. (Tr. 282-83). These symptoms were similar to those for which Wicke sought treatment in 1993. (*Id.*). He admitted that he had not followed up with a psychiatrist in three or four years and was getting his prescription filled by his primary care physician. (Tr. 283). Wicke also reported that he had problems with his employment – he had been working as a heavy equipment operator, but lost his driver's license after a driving under the influence offense and could not work after that. (*Id.*).

His mental status examination revealed that he was cooperative, with good eye contact. (Tr. 284). His mood was depressed and irritable with congruent affect, and he reported paranoid thoughts. (*Id.*). His memory was intact, his insight and judgment were fair, and he reported no suicidal or homicidal thoughts. (*Id.*). Based on this, Dr. Ahmed diagnosed Wicke with bipolar disorder mixed type with psychotic features and assigned him a Global Assessment of

5

Functioning (GAF) score of 45.[3] (Tr. 285). He started Wicke on Depakote and characterized his prognosis as fair. (*Id.*).

During a follow-up appointment on August 21, 2007, Wicke reported that he continued to experience paranoia, poor sleep, and racing thoughts. (Tr. 279). He was "stressed out" due to family issues, and Dr. Ahmed added temazepam to his medication regime. (Tr. 279-80). Wicke returned to the VA Medical Center for medication management and mental status monitoring on October 4, 2007, reporting that his mood had been stable and that he was not experiencing paranoia or racing thoughts. (Tr. 276). His Risperdal dose was increased and, at his next visit, on November 1, 2007, he reported that his sleep had improved and he continued to be free of paranoia and racing thoughts. (Tr. 273).

At a follow-up visit on March 14, 2008, Wicke reported feeling "less stressed out" on a higher dosage of Depakote. (Tr. 261). Two months later, on May 15, 2008, Wicke reported that his mood was stable, he was sleeping well, and was not experiencing paranoia or racing thoughts. (Tr. 258). His Risperdal dosage was lowered. (Tr. 259). At a return visit on August 18, 2008, nothing had changed: although Wicke was still stressed about familial issues, his sleep had improved, his mood had stabilized, and he continued to be free of paranoia and racing thoughts. (Tr. 247-48). Subsequent treatment notes indicate similar findings, evidencing that Wicke's psychological symptoms improved with medication, he was "doing well overall," and he was experiencing no side effects from the medication. (Tr. 342-43, 349-50, 392).

*(b)    Residual Functional Capacity Assessment*

On February 11, 2009, H.C. Tien, M.D., reviewed Wicke's then-available records and

---

[3] GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations. *See White v. Commissioner of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

6

completed a Mental Residual Functional Capacity ("RFC") Assessment and a Psychiatric Review Technique. (Tr. 302-19). Dr. Tien noted that Wicke suffers from depression (an affective disorder as defined in Listing 12.04) and bipolar disorder (an anxiety-related disorder as defined in Listing 12.06). (Tr. 302, 305, 307). Dr. Tien opined that Wicke is moderately limited in his activities of daily living, social functioning, and maintaining concentration, persistence, and pace, and has experienced one or two episodes of decompensation (each of extended duration).[4] (Tr. 312). Dr. Tien concluded that, from a psychiatric viewpoint, Wicke could perform "a wide range of unskilled tasks in a regular work environment." (Tr. 318).

### 4. *Vocational Expert's Testimony*

Norman Abeles testified as an independent vocational expert ("VE"). (Tr. 82-88). The VE characterized Wicke's past relevant work as semi-skilled in nature, and light exertion. (Tr. 83). The ALJ asked the VE to imagine a claimant of Wicke's age, education, and work experience, who was able to perform light unskilled work, with the following limitations: he must be able to sit or stand alternatively at will, provided he is not off task for more than 10% of the work period; he may perform only occasional reaching with his right upper extremity and

---

[4] Specifically, in his RFC Assessment, Dr. Tien opined that Wicke has no evidence of limitation in his ability to maintain attention and concentration for extended periods; accept instructions and respond appropriately to criticism from supervisors; and travel in unfamiliar places or use public transportation. (Tr. 316-17). Dr. Tien further opined that Wicke is not significantly limited in his ability to remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; carry out detailed instructions; sustain an ordinary routine without special supervision; make simple work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; get along with co-workers without distracting them; respond appropriately to changes in the work setting; and be aware of normal hazards and take appropriate precautions. (*Id.*). Dr. Tien further opined that Wicke is moderately limited in the ability to understand and remember detailed instructions; perform activities within a schedule and maintain regular attendance; work in coordination with or proximity to others without being distracted by them; complete a normal workday or workweek without interruptions from psychological symptoms; maintain socially appropriate behavior; and set realistic goals or make plans independently of others. (*Id.*).

only occasional right overhead reaching; he is able to remember and carry out one- to two-step instructions, but is limited to only occasional interaction with the public; he is able to understand, remember, and carry out simple instructions and make judgments on simple work-related decisions; and he is able to interact appropriately with supervisors and coworkers in a routine work setting and respond to usual work situations and changes in a routine work setting. (Tr. 84). The VE testified that the hypothetical individual would not be capable of performing Wicke's past relevant work. (*Id.*). However, the VE testified that the individual would be capable of working in the position of inspector/checker (10,000 jobs in the lower half of the lower peninsula of Michigan), assembler (10,000 jobs), or bench hand (10,000 jobs). (Tr. 85).

### C. Framework for Disability Determinations

Under the Act, DIB are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work,

>benefits are denied without further analysis.
>
>Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Commissioner of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§404.1520, 416.920); *see also Heston v. Commissioner of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps …. If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Secretary of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D. The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Wicke is not disabled under the Act.  At Step One, the ALJ found that Wicke has not engaged in substantial gainful activity since October 29, 2008, his alleged onset date.  (Tr. 48).  At Step Two, the ALJ found that Wicke has the severe impairments of bipolar disorder; depression; anxiety disorder; diabetes mellitus; obesity; hypertension; right shoulder pain, status post rotator cuff tear repair surgery; and degenerative joint disease of the right hip.  (*Id.*).  At Step Three, the ALJ found that Wicke's physical impairments do not meet or medically equal a listed impairment.  (Tr. 48-49).  The ALJ also concluded that Wicke's mental impairments, whether considered alone or in combination, do not meet or medically equal Listing 12.04 (for affective disorders) or Listing 12.06 (for anxiety-related disorders).  (Tr. 49-50).

The ALJ then assessed Wicke's residual functional capacity ("RFC"), concluding that he is capable of performing light work, with the following limitations:  he must be able to sit or stand alternatively at will, provided he is not off task for more than 10% of the work period; he may perform only occasional reaching with his right upper extremity and only occasional right

overhead reaching; he is able to remember and carry out one- to two-step instructions, but is limited to only occasional interaction with the public; he is able to understand, remember, and carry out simple instructions and make judgments on simple work-related decisions; and he is able to interact appropriately with supervisors and coworkers in a routine work setting and respond to usual work situations and changes in a routine work setting. (Tr. 50-52).

At Step Four, the ALJ determined that Wicke is unable to perform his past relevant work as a heavy equipment operator or truck driver, both of which are semi-skilled in nature and performed at a light exertional level. (Tr. 53). At Step Five, the ALJ concluded, based in part on the VE's testimony, that Wicke is capable of performing a significant number of jobs that exist in the national economy. (Tr. 53-54). As a result, the ALJ concluded that Wicke is not disabled under the Act. (Tr. 54).

### E. Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Commissioner of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Commissioner of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Rogers v. Commissioner of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Secretary of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Secretary of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *Kornecky v. Commissioner of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Secretary of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F. Analysis

Although Wicke's argument before this court is somewhat undeveloped, the crux of it appears to be the following portion of his brief:

> The ALJ opined in his decision that Mr. Wicke was capable of performing

> a range of sedentary work and that there were jobs that existed in significant numbers in the national economy that the claimant could have performed. (Tr. 85). However, when the ALJ posed the hypothetical/RFC to the VE at trial, and asked whether there would be any work that such an individual could perform if the individual would be required to "lift up to 20 pounds occasionally and lift and carry up to 10 pounds frequently, the VE clearly testified that there would not be any work that such an individual could perform. (Tr. 84). The ALJ completely ignored the additional limitation of Mr. Wicke's bi-polar related concentration issues when inquiring as to whether there were other jobs in the national economy that the claimant could perform.

(Doc. #9 at 8). As an initial matter, the court notes several glaring inaccuracies in Wicke's argument (some of which also were pointed out by the Commissioner in his brief). For example, the ALJ found Wicke capable of performing a reduced range of *light* work, not sedentary work as Wicke alleges (and the record citation Wicke offers in support of his incorrect assertion is, not surprisingly, incorrect). (Tr. 50). In addition, the VE did not, in response to the ALJ's hypothetical, "clearly testify" that the hypothetical individual would be precluded from all work; rather, the VE testified that the hypothetical individual would be able to work in the positions of inspector/checker (10,000 jobs in the lower half of the lower peninsula of Michigan), assembler (10,000 jobs), or bench hand (10,000 jobs). (Tr. 85).

Finally, and perhaps most importantly, the ALJ did not "completely ignore[] the additional limitation of Mr. Wicke's bi-polar related concentration issues when inquiring as to whether there were other jobs in the national economy that the claimant could perform," as Wicke asserts. (Doc. #9 at 8). To the contrary, the ALJ recognized, and appropriately considered, that Wicke experienced moderate limitations in concentration, persistence, and pace, a conclusion which is supported by Wicke's treatment records, Dr. Tien's mental RFC assessment, and Wicke's own hearing testimony. (Tr. 49-52).

In his decision, the ALJ discussed the fact that, at Wicke's Psychiatric/Psychosocial Assessment in July of 2007, he complained to Dr. Ahmed of paranoia, poor sleep, and racing

12

thoughts. (Tr. 52). The ALJ noted, however, that, over time, Wicke's mental symptoms "stabilized with medication" (Tr. 52), a conclusion which is supported by the medical evidence in the record and Wicke's own testimony. (*See, e.g., supra* at 6; Tr. 72, 80, 247-48, 258, 261, 342-43, 349-50, 392). In addition, the ALJ gave "great weight" to Dr. Tien's Mental RFC Assessment, which specifically concluded that, although Wicke was moderately limited in concentration, persistence, and pace, he could perform "a wide range of unskilled tasks in a regular work environment." (Tr. 49, 318). That weight was appropriate as it was consistent with the medical evidence just described. 20 C.F.R. §404.1527(c); 20 C.F.R. §416.929(e); *Gayheart v. Commissioner of Social Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). Lastly, the ALJ noted Wicke's testimony that (a) he had been able to work for many years while taking the same medication he was then-currently prescribed for his mental impairments; (b) he eventually stopped working only because his doctor would not certify that he was able to safely operate heavy equipment while taking these prescription medications, evidence the ALJ appropriately considered at Step Four by concluding that Wicke could not perform his past relevant work (Tr. 53); and (c) he believed that, despite his bipolar disorder, he could still perform simple tasks. (Tr. 50, 52, 68, 70). All of this evidence provides ample support for the ALJ's conclusion that Wicke is moderately limited with respect to concentration, persistence, and pace.

The ALJ then accommodated Wicke's mental limitations by limiting him to jobs that require only the ability to remember and carry out simple, one- to two-step instructions and make judgments on simple work-related decisions. (Tr. 49-52).[5] Courts have held that similar limitations are adequate to account for moderate deficiencies in concentration, persistence, and

---

[5] Such a limitation is consistent with Wicke's own testimony that, while his alleged concentration limitations make it difficult for him to "do anything that requires a lot of steps or … a number of parts to it," he is capable of performing simple tasks. (Tr. 76).

13

pace. *See, e.g., Layne v. Commissioner of Soc. Sec.*, 2009 WL 2496474, at *3 (E.D. Mich. Aug. 17, 2009) (substantial evidence supported ALJ's finding that claimant with moderate deficiencies in concentration, persistence, and pace could perform simple, unskilled work of "1-2-3- step operations"); *Berkowski v. Commissioner of Soc. Sec.*, 652 F. Supp. 2d 846, 860 (E.D. Mich. 2009) (ALJ's limitation of claimant, who had moderate deficiencies in concentration, persistence, and pace, to "simple, unskilled work with one, two or three step instructions" was sufficient). And, where the ALJ posed a hypothetical question to the VE which included these limitations, and reasonably accepted the VE's testimony that the hypothetical individual described could perform work which exists in significant numbers in the state of Michigan, the VE's testimony provides substantial evidence to support the ALJ's finding that Wicke is not disabled. *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) (where hypothetical accurately described the plaintiff in all relevant respects, the VE's response to the hypothetical question constitutes substantial evidence).

In this case, aside from summarily characterizing the limitations contained in the RFC finding as "behavioral," Wicke does not even attempt to explain how the ALJ's RFC finding and hypothetical question fail to adequately account for his mental limitations, (Doc. #9 at 11). Instead, Wicke baldly asserts that his difficulties with concentration would render him "non-productive for approximately 20% of the time while at work," and that the VE testified that such a limitation would be work preclusive. (*Id.* at 8). Wicke points to no evidence in the record supporting such a limitation, however, and indeed there is none. An ALJ is only required to pose those hypothetical limitations that he finds credible. *See White v. Astrue*, 2008 WL 2780658, at *9 (E.D. Mich. July 16, 2008) (citing *Stanley v. Secretary of Health & Human Servs.*, 39 F.3d 115, 118 (6th Cir. 1994)). Here, where the ALJ included all of the limitations he had properly

14

found credible, the VE's testimony was sufficient and the ALJ was entitled to rely upon it. Therefore, substantial evidence supports the ALJ's conclusion that Wicke is not disabled.[6]

## III. CONCLUSION

For the foregoing reasons, the court RECOMMENDS that the Commissioner's Motion for Summary Judgment [12] be GRANTED, Wicke's Motion for Summary Judgment [9] be DENIED, and the ALJ's decision be AFFIRMED.

Dated: April 18, 2013　　　　　　　　　　　　s/David R. Grand
Ann Arbor, Michigan　　　　　　　　　　　　DAVID R. GRAND
　　　　　　　　　　　　　　　　　　　　　United States Magistrate Judge

## NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981). The filing of objections which raise some issues, but fail

---

[6] In his motion for summary judgment, Wicke also identifies a second issue, namely "[w]hether the Commissioner erred as a matter of law by incorrectly concluding that Mr. Wicke's disability did not arise before October 29, 2008." (Doc. #9 at 7). In his brief, however, Wicke fails entirely to explain why he believes his disability arose prior to the alleged onset date. Indeed, it was Wicke who identified October 29, 2008 as his alleged onset date (Tr. 159), and there is no indication in the record that he ever sought to amend that date. The ALJ thoroughly considered all of the medical evidence in the record (including evidence that pre-dated Wicke's alleged onset date) and concluded that Wicke is not disabled under the Act. Here, where Wicke has offered no factual or legal support whatsoever for his assertion that the ALJ erred in concluding that his disability "did not arise before October 29, 2008," this argument is waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to … put flesh on its bones."). And, even if not waived, for these same reasons, the argument lacks merit.

to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 18, 2013.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager